UNITED STATES of America, Plaintiff–Appellant/Cross–Appellee,

v.

U.S. CURRENCY IN THE AMOUNT OF $119,984.00, MORE OR LESS, Defendant–Appellee/Cross–Appellant,

Cesar Castro and Maria Ansueto, Claimants.

Nos. 01–6077, 01–6193.

United States Court of Appeals, Second Circuit.

Argued: April 25, 2002.

Decided: Sept. 5, 2002.

David L. Goldberg, Assistant United States Attorney, Brooklyn, N.Y. (Alan Vinegrad, United States Attorney for the Eastern District of New York, Deborah B. Zwany, Arthur P. Hui, Assistant United States Attorneys, of counsel), for plaintiff-appellant/cross-appellee United States of America.

Steven L. Kessler, Law Offices of Steven L. Kessler, New York City (Eric M. Wagner, of counsel), for claimants Cesar Castro, Maria Ansueto.

Before: F.I. PARKER, STRAUB, and SOTOMAYOR, Circuit Judges.

STRAUB, Circuit Judge.

This appeal stems from the seizure of United States currency totaling approximately $119,984 by the United States Customs Service from claimant Cesar Castro as he was attempting to leave the country; Castro's subsequent criminal prosecution, guilty plea and sentencing; and the ensuing civil forfeiture action. Plaintiff–Appellant–Cross–Appellee United States of America ("Government") appeals from a judgment entered March 8, 2001 by the United States District Court for the Eastern District of New York (Charles P. Sifton, *Judge*) in the forfeiture action brought against the seized currency. The District Court granted summary judgment to claimants Castro and Maria Ansueto and dismissed the forfeiture action, reasoning that its earlier findings at Castro's sentencing regarding the source and intended use of the currency estopped the Government from arguing in the forfeiture action

that the currency was either derived from an unlawful source or intended for an unlawful use. *See United States v. U.S. Currency in the Amount of $119,984 ("$119,-984")*, 129 F.Supp.2d 471 (E.D.N.Y.2001). We disagree, and for the reasons stated below, we vacate the judgment of the District Court and remand for further proceedings consistent with this opinion. Claimants cross-appeal from the District Court's unreported bench ruling on June 4, 2001, denying them pre-judgment interest on the seized funds, but we need not reach the merits of the cross-appeal.

### BACKGROUND

On November 22, 1996, at the John F. Kennedy International Airport in New York City, Cesar Castro was preparing to board a flight to the Dominican Republic when he was stopped by an inspector of the United States Customs Service. After Castro was advised orally and in writing that anyone transporting more than $10,000 in currency into or out of the United States is required to file a declaration to that effect, he signed a written declaration that he was carrying $2,000 in currency. The customs inspector then searched Castro's briefcase, discovering $11,500 in hundred-dollar bills. Castro apologized, but denied having any additional currency to report. The inspector proceeded to search Castro's person and remaining luggage, and found additional undeclared currency. In total, Castro was carrying $119,984 in United States currency, concealed on his person and in his luggage. He was arrested and the currency was seized.

In an indictment filed on December 5, 1996, Castro was charged with one count of violating the currency reporting provisions of 31 U.S.C. § 5316[1] and one count of making false statements in violation of 18 U.S.C. § 1001. On January 16, 1997, pursuant to a written plea agreement, Castro pled guilty to violating the currency reporting law.

In the plea agreement, the United States Attorney's Office for the Eastern District of New York ("Office"), "[b]ased upon information now known to it," estimated the likely offense level under the United States Sentencing Guidelines then in effect ("1995 Guidelines") to be level four. This conclusion was based on the following calculation: subsection 2S1.3(a) of the 1995 Guidelines provided a base offense level of six,[2] and two levels were deducted pursuant to subsection 3E1.1(a) for Castro's acceptance of responsibility, yielding an adjusted offense level of four. The plea agreement further provided that "the Office recommends to the Probation Department that the calculation set forth ... be adopted. If the Probation Department finds that any portion of the calculation set forth ... is incorrect, the Office reserves the right to argue that the Court should adopt the Probation Department's finding." Significantly, the agreement "[did] not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or ad-

---

1. The statute provides in relevant part that "a person ... shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly ... transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time ... from a place in the United States to or through a place outside the United States." 31 U.S.C. § 5316(a).

2. Subsection 2S1.3 of the 1995 Guidelines provided for a base offense level of "6 plus the number of offense levels from the table in § 2F1.1 (Fraud and Deceit) corresponding to the value of the funds." The record does not reveal why the offense level calculation in the agreement ignored the clause of subsection 2S1.3(a) that provided for an increased offense level based on the amount of the funds.

ministrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability or forfeiture of assets."

Prior to his sentencing, Castro was interviewed by the Probation Department. At the interview, he stated that the money at issue was a loan from claimant Maria Ansueto, the mother-in-law of his recently remarried ex-wife, and he submitted several documents to show that Ansueto had the financial resources to make such a loan. On March 11, 1997, the Probation Department issued a Pre–Sentence Report ("PSR") that recommended that the District Court sentence Castro based on an offense level of four. The PSR, like the plea agreement, proposed an initial base offense level of six under subsection 2S1.3(a). But unlike the plea agreement, the PSR recommended increasing the base offense level by six levels, also pursuant to subsection 2S1.3(a), to account for the value of the $119,984 in funds. *See* 1995 Guidelines §§ 2S1.3(a); 2F1.1(b)(1)(G). The PSR also found that Castro's statements during his pre-sentence interview and the documents that he provided to the Probation Department "seem to support the fact that it was possible for Ms. Ansueto to be in possession of funds in the amount allegedly loaned to the defendant." Therefore, according to the PSR, "[t]he defendant has provided proof that the funds were the proceeds of lawful activity, and they were to be used for a lawful purpose." Accordingly, the PSR recommended a six-level reduction based on subsection 2S1.3(b)(2), which was not mentioned anywhere in the plea agreement and provided:

If (A) subsection (b)(1) [corresponding to related unlawful activity] does not apply; (B) the defendant did not act with reckless disregard of the source of the funds;

(C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level 6.

Lastly, the PSR, like the plea agreement, recommended a reduction of two levels for Castro's acceptance of responsibility, pursuant to subsection 3E1.1(a), yielding a final adjusted offense level of four.

At a hearing on March 27, 1997, the District Court sentenced Castro to two years' probation and a $2,500 fine. At the hearing, the following colloquy occurred:

THE COURT: So this money is going to be forfeited?

MR. TATUM [Assistant United States Attorney]: Is that directed at the government or Ms. Monasebian [defense counsel]?

THE COURT: Well, forfeiture doesn't happen without both sides having something to say about it. I take it you're not contesting the forfeiture?

Ms. MONASEBIAN: Right now the forfeiture proceedings are in abeyance pending resolution in this case, Your Honor.

THE COURT: What's going to happen when they are no longer in abeyance?

Ms. MONASEBIAN: I believe, based upon the probation report and the documents we submitted, that there was no illegal proceeds involved in this case, and the funds were not to be used for anything improper and, based upon that, I believe we'll be trying to get the money returned to us in a civil proceeding after this case is determined, Your Honor.

THE COURT: Okay.

Ms. MONASEBIAN: Your Honor, if I may—

THE COURT: Does the government have any position on that at this point or not?

Mr. Tatum: No, the government does not.

The Court: Does not.

Mr. Tatum: Have a position.

The Court: Okay. Yes, did you have something else you wanted to say?

Ms. Monasebian: Just that the defendant provided the proof that the funds were the proceeds of lawful activity and they were to be used for lawful purpose [*sic* ], and that is indicated on page 5 of the report.

The Court: Well, I'm not making a finding on that. I will not prejudge the issue.

Ms. Monasebian: I understand, Your Honor.

The Court: I mean, I don't have enough evidence here to find that the funds were the proceeds or are to be used for any illegal purpose.

Well, I said that, but then I see that actually this sentence is based on a specific offense characteristic, which the defendant is entitled to upon a showing that he did not act with reckless disregard to the source of the funds, that the funds were the proceeds of lawful activity, and the funds were used for lawful purpose [*sic*].

I have to say having read it, it doesn't make much sense, since if the funds were the proceeds of lawful activity, I don't know what it means to say that the defendant did not act with reckless disregard of the fact that they were the proceeds of lawful activity.

In any event, it seems to me he's entitled to this, if there's evidence to support that finding. The evidence is recited in the probation report, and the government has not—is disputing—is not offering me any evidence in this proceeding to the contrary. Accordingly, I'm prepared to accept the conclusion of the Probation Department that this is a case in which the offense level is appropriately decreased to a level six.

Whatever the impact of a government's failure to offer any proof to rebut this proffer by the defendant in the context of the criminal sentencing proceeding, may have in the context of a forfeiture proceeding, I leave to the finder of fact in the forfeiture proceeding.

I just want clear what's going on here, whether this will act as some kind of collateral estoppel or res judicata, I rather doubt, since the government's motivation in the context of sentencing is certainly quite different than its motivations in securing the forfeiture of money, but might be wrong. Maybe this is an estoppel of some sort.

The District Court then proceeded to adopt the findings of the PSR and impose sentence accordingly. The written judgment of the District Court, reflecting the sentence imposed at the hearing, was filed on April 2, 1997.

The United States Customs Service had commenced administrative forfeiture proceedings against the seized currency, pursuant to 31 U.S.C. § 5317(c) (1996),[3] on December 4, 1996, the day before the indictment was filed. However, those proceedings had been stayed during the pendency of Castro's criminal proceedings. After Castro's sentencing, the administrative proceedings resumed but proceeded slowly for the next two years. On April 2,

---

**3.** The version of 31 U.S.C. § 5317(c) in effect in 1996 provided: "If a report required under section 5316 with respect to any monetary instrument is not filed (or if filed, contains a material omission or misstatement of fact), the instrument and any interest in property, including a deposit in a financial institution, traceable to such instrument may be seized and forfeited to the United States Government."

1999, the United States Customs Service referred the case to the United States Attorney's Office for the Eastern District of New York, and on April 9, 1999, the Office filed the complaint in this judicial forfeiture action.

Claimants Castro and Ansueto filed a motion to dismiss the forfeiture action and/or for summary judgment on December 30, 1999. Castro and Ansueto argued that the District Court's factual findings at sentencing collaterally estopped the Government from contending in the forfeiture proceedings that the source and intended use of the funds were anything other than lawful, and that forfeiture of money with no connection to unlawful activity would violate the "excessive fines" clause of the Eighth Amendment.[4] The Government, in response, argued that it lacked sufficient opportunity and motive to litigate the source or intended use of the funds at sentencing, that those issues were not actually litigated, and that it would not be fair or efficient to apply collateral estoppel to the proceedings. Therefore, the Government argued, estoppel should not apply and the source and intended use of the currency could be litigated in the forfeiture proceedings.

By a memorandum and order dated January 11, 2001, the District Court granted the claimants' motion, which it treated as a summary judgment motion, and dismissed the forfeiture action. See $119,984, 129 F.Supp.2d 471. The District Court found that the issues involved in both proceedings were identical for purposes of collateral estoppel, that "the issue of the legality of the currency's source was actually litigated and decided for collateral estoppel purposes in Castro's sentencing proceeding," that the Government "had a full and fair opportunity to litigate the issue of the source of the currency," that the sentencing findings were "legally necessary," and that "[i]t is here clearly fair and efficient to give preclusive effect to the findings with respect to the source and use of the currency." Id. at 477–78. Accordingly, the District Court held that the Government was "estopped from relitigating the source of the currency at issue."[5] Id. at 478. Given its finding at sentencing that the funds were derived from a lawful source, the District Court then held that forfeiture of the funds would constitute an excessive fine under the Eighth Amendment. See id. at 478–80 (citing United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)).

Judgment dismissing the action was entered on March 9, 2001, but execution of the judgment was stayed pending appeal. In a bench ruling issued on June 4, 2001 and docketed on June 14, 2001, the District Court denied the claimants' motion to amend the judgment to provide for pre-judgment interest and to transfer the funds at issue to the claimants' counsel pending appeal. The Government filed a timely notice of appeal of the judgment, and the claimants timely cross-appealed the District Court's ruling on pre-judgment interest.

## DISCUSSION

In reviewing the District Court's decision in this case, we are presented with an issue rarely considered by this or any other Circuit: the applicability of collateral estoppel based upon earlier sentencing findings. As we held when we first ad-

---

4. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

5. The context makes clear that this holding implicitly extends to the intended use of the seized currency, although the District Court did not expressly state that conclusion.

dressed this issue in a related context, "[w]e review a district court's grant of summary judgment based on the doctrine of collateral estoppel *de novo*, construing the record in the light most favorable to the non-moving party and drawing all inferences in that party's favor." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 303 (2d Cir.1999) (citation omitted).

## I. Collateral Estoppel and *S.E.C. v. Monarch Funding Corp.*

 Under the doctrine of collateral estoppel, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (citation and internal quotation marks omitted); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Generally, for collateral estoppel to apply, four prerequisites must be satisfied: (1) the issues in both proceedings must be identical; (2) the issue must have been actually litigated and actually decided in the prior proceeding; (3) there must have been a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue must have been necessary to support a valid and final judgment on the merits. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998); *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987).

We have long held that "a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. Podell*, 572 F.2d 31, 35 (2d Cir.1978) (citations omitted). But in *S.E.C. v. Monarch Funding Corp.*, we considered, as a matter of first impression, the related question of "whether findings made in a criminal sentencing proceeding may preclude relitigation of an issue in a subsequent civil case." 192 F.3d at 298. The underlying criminal proceeding in *Monarch* involved a conviction after trial, while the instant case involves a guilty plea. Also, the roles were the reverse of those in this case: in *Monarch*, the Government, not the former criminal defendant, sought collateral estoppel. Nevertheless, we did not limit our holding to such circumstances; instead, we stated in broad and emphatic terms that "precluding relitigation on the basis of [sentencing] findings should be presumed improper." *Id.* at 306.

We began, in *Monarch*, by acknowledging that collateral estoppel involves a balancing of fairness and efficiency: the fairness of ensuring a correct result, weighed against the efficiency of preventing relitigation of a single issue. *See id.* at 304. "When the efficiency rationale for collateral estoppel fails ... courts have understandably declined to apply the doctrine." *Id.* at 304 (citations omitted). Similarly, "there are some circumstances that so undermine confidence in the validity of an original determination as to render application of the doctrine impermissibly 'unfair' to a defendant." *Id.* (citation omitted). Thus, where fairness concerns are particularly strong, or efficiency gains are relatively meager, courts tend to refrain from applying collateral estoppel. *See id.* at 304.

Applying these general principles, we then explained that the application of collateral estoppel based upon prior sentencing findings implicates serious concerns of fairness, while appearing to offer little benefit in terms of increased efficiency. *See id.* at 304–06. Civil proceedings offer procedural opportunities that differ from

those available at sentencing and "that could command a different result." *Id.* at 305. Also, "the incentive to litigate a sentencing finding is frequently less intense, and certainly more fraught with risk, than it would be for a full-blown civil trial." *Id.* With regard to efficiency, we found that "several considerations suggest that ... applying collateral estoppel in the sentencing context will just as often multiply, rather than reduce, total litigation." *Id.* In particular, the threat of estoppel at subsequent civil proceedings "may greatly increase the stakes at sentencing, producing more exhaustive litigation over matters of only tangential importance"—turning sentencings into "mini-trials." *Id.* at 305–06 (citation omitted).

While we found that these concerns were not so severe as to warrant a *per se* rule barring the application of collateral estoppel to sentencing findings, we nevertheless held that such application of estoppel is presumptively improper. *See id.* at 306. Therefore, in cases in which a party seeks to invoke collateral estoppel based upon prior sentencing findings, estoppel should be applied only if "it is clearly fair and efficient to do so."[6] *Id.* Consideration of efficiency should be a "threshold assessment," and if a court finds that the application of estoppel "will not promote efficiency, it should feel free to deny preclusion for that reason alone."

*Id.* at 310. Consideration of fairness, as *Monarch* illustrates, *id.* at 306–09, encompasses consideration of the four traditional prerequisites to the application of collateral estoppel. *See Boguslavsky*, 159 F.3d at 720; *Gelb*, 798 F.2d at 44.

The Government concedes, for purposes of this appeal, that the issues at sentencing and in the forfeiture proceeding were identical, that the District Court actually decided that the source and intended use of the currency were lawful, and that the District Court's determination as to source and intended use was necessary to the sentencing. Accordingly, we turn to those matters actually in dispute: whether it would be "efficient" to apply collateral estoppel in this case, whether the source and intended use of the currency were "actually litigated" at sentencing, and whether the Government had a "full and fair opportunity" to litigate those issues. In considering these questions, we bear in mind *Monarch*'s strong presumption against application of collateral estoppel based upon sentencing findings. For the reasons discussed below, we hold that the District Court erred in applying collateral estoppel in the forfeiture proceeding based upon its findings at Castro's sentencing.

## II. Efficiency

The District Court did not make a "threshold assessment" of efficiency, as re-

---

**6.** We have applied *Monarch* only once since it was decided in September 1999. In *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 87 (2d Cir.2000), an antitrust action stemming from a bid-rigging conspiracy, we affirmed a district court decision that sentencing findings in an underlying criminal proceeding did not preclude litigation of damages causation in the antitrust suit. We treated the estoppel issue very briefly, invoking *Monarch*'s presumption against the use of collateral estoppel based upon sentencing findings. District courts in this Circuit also have had little occasion to apply *Monarch*. *See United States v. Lamanna*, 114 F.Supp.2d

193, 197 (W.D.N.Y.2000) (although amount of restitution ordered at sentencing suggested a finding that defendant wrongfully obtained disability benefits, it would not be "clearly fair and efficient" to estop defendant from denying such liability in subsequent action for civil penalties); *cf. S.E.C. v. Tandem Mgmt. Inc.*, No. 95 Civ. 8411, 2001 WL 1488218, at *11 (S.D.N.Y. Nov. 21, 2001) (where "facts at issue ... were developed not at a sentencing hearing but at a criminal trial," *Monarch* does not apply and estoppel is appropriate in subsequent action for injunctive relief). Our sister circuits also have offered little guidance on these matters.

quired by *Monarch,* 192 F.3d at 310, but instead considered the issue of efficiency after it addressed the four traditional prerequisites to collateral estoppel. *See* *$119,984,* 129 F.Supp.2d at 476–78. Nevertheless, because in this context a court may deny preclusion solely upon a finding that it would not promote efficiency, we must begin our analysis by determining whether it would be efficient to preclude further litigation of the source and intended use of the currency.

When we weigh the efficiency of applying estoppel, we necessarily speak in somewhat hypothetical terms. Application of collateral estoppel always is "efficient," in a limited sense, because it prevents further litigation of an issue in the case at hand. But our inquiry does not end there. If we agree with the District Court that collateral estoppel was properly applied in this case, parties in similar future cases may anticipate a comparable application of collateral estoppel in those cases and, as a result, may litigate differently than they otherwise would. If it is likely that the availability of collateral estoppel in such cases would result in more streamlined litigation, then the efficiency rationale underpinning the doctrine would be well served by its application in this case. If, on the other hand, the availability of collateral estoppel probably would not save the parties time or effort—if, for example, the risk of collateral estoppel would create an incentive to aggressively litigate minor issues early in the litigation—then efficiency would not be promoted by application of the doctrine.

Had the Government anticipated the application of collateral estoppel based upon the sentencing findings, it surely would have litigated the source and intended use of the currency at or prior to sentencing. Most likely, the pre-sentencing litigation would have taken the form of a multi-witness evidentiary hearing pursuant to *United States v. Fatico,* 579 F.2d 707 (2d Cir.1978)—precisely the sort of "mini-trial" that was among the potential inefficiencies we enumerated in *Monarch,* 192 F.3d at 306. The resolution of Castro's criminal proceedings would have been delayed. And the initial burden of determining the source and intended use of the currency would have been shifted from the United States Customs Service, which handled the first phase of forfeiture proceedings in this case and has the benefit of administrative expertise in the area, to the District Court. Even if the District Court had held a full *Fatico* hearing on these issues prior to sentencing, the losing parties likely would have litigated the applicability of collateral estoppel in the forfeiture action, regardless of which party prevailed at the *Fatico* hearing.

Thus, application of collateral estoppel probably would have lengthened the criminal proceedings without significantly shortening the civil forfeiture proceedings. The burden on the courts would have been shifted, but the improvement in the efficiency of the forfeiture proceedings would have been incremental. Nevertheless, the prospect of even a minor efficiency benefit from the application of estoppel in this case makes it difficult for us to conclude definitively that "the doctrine will not promote efficiency" in the forfeiture proceedings, and therefore we will not "deny preclusion for that reason alone." *Monarch,* 192 F.3d at 310. Instead, we proceed to consider the fairness of precluding further litigation.

## III. Fairness

In determining whether it would be "fair" to apply collateral estoppel, we examine the two estoppel prerequisites that remain in dispute: whether, in connection with Castro's sentencing, the Government

had a "full and fair opportunity" to litigate the source and intended use of the currency and whether the Government "actually litigated" those issues. *See Boguslavsky,* 159 F.3d at 720.

## A. "Full and Fair Opportunity"

Under *Monarch,* collateral estoppel cannot be applied unless we determine that the Government had a full and fair opportunity in the criminal proceedings to litigate the source and intended use of the currency. *See Monarch,* 192 F.3d at 306 (citing *Gelb,* 798 F.2d at 44–45). There can be no question that the Government had the opportunity, both in negotiating Castro's plea agreement and in preparing for the sentencing, to litigate the source and intended use of the currency. Whether that opportunity was "fair," however, is a more complex question.

 In *Monarch,* we noted that serious fairness concerns arise "where a defendant has little incentive to litigate the relevant issue vigorously in the original action." *Id.* at 304. Here, the Government argues that it lacked sufficient incentive at Castro's sentencing to litigate the source of the seized currency. At the time of the plea and sentencing in this case, we had upheld against Eighth Amendment challenge the forfeiture of the entire sum of money involved in a violation of 31 U.S.C. § 5316 despite the apparent absence of proof that the money was derived from an unlawful source. *See United*

States v. U.S. Currency in the Amount of $145,139.00, 18 F.3d 73, 76 (2d Cir.), cert. denied sub nom. Etim v. United States, 513 U.S. 815, 115 S.Ct. 72, 130 L.Ed.2d 27 (1994). It was only after Castro's sentencing that the United States Supreme Court, for the first time, held that a punitive forfeiture violates the Eighth Amendment "if the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian,* 524 U.S. 321, 337, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). The Supreme Court found that although the defendant, like Castro, had pled guilty to a violation of the currency reporting statute, 31 U.S.C. § 5316, there was no indication that the relevant funds were related to other "illegal activities," and held that it would be unconstitutional to require forfeiture of the entire sum that the defendant had sought to remove from the country. *See id.* at 337–40, 118 S.Ct. 2028. According to the Government, *Bajakajian* called into question our decision in *$145,139.00* and suggested that where seized currency is otherwise unrelated to illegal activity, forfeiture of the entire sum might violate the Eighth Amendment.[7] The Government asserts that because the law at the time of sentencing, in contrast to *Bajakajian,* permitted the forfeiture of the entire sum of money even where the money was derived from a lawful source, it lacked adequate incentive to litigate the source of the currency.[8]

---

7. However, *Bajakajian* does not appear to bar forfeiture of some amount less than the entire sum in such circumstances.

8. The claimants contend that the Government's *Bajakajian* argument was not raised below and therefore has been waived. We "generally will not address an issue first raised on appeal except to prevent obvious injustice or, in rare cases, when the issue is suitable for decision on the record, without additional factfinding." *Suez Equity Inves-*

*tors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 104 (2d Cir.2001) (citations omitted). Here, though, no additional fact-finding is necessary to assess the significance of *Bajakajian.* Moreover, although the District Court did not address *Bajakajian,* it did consider the "incentives" argument generally. *See $119,984,* 129 F.Supp.2d at 478.

However, as the District Court found, the possibility that the Government had different incentives in the sentencing than in the forfeiture action "is not to say that it did not have a substantial motivation to litigate the issue [of the source of the currency] in both contexts. The government's desire to impose appropriate punishment for persons who secretly export the proceeds of illegal activity is at least as great if not greater than the need to add $120,000 to the United States Treasury." *$119,984*, 129 F.Supp.2d at 478. Indeed, without the benefit of the adjustment for lawful source and intended use under subsection 2S1.3(b)(2) of the 1995 Guidelines, Castro would have been subject to an adjusted offense level of ten (base level six under subsection 2S1.3(a) plus six levels for the amount of the funds, also pursuant to subsection 2S1.3(a), minus two levels for acceptance of responsibility under subsection 3E1.1(a)). He therefore would have faced a Guidelines range of six to twelve months' incarceration, rather than the zero-to-six month range that the District Court applied. Under the law at the time, the Government may have lacked the incentive to obtain a finding that either the source or intended use was unlawful in order to ensure that the funds would be forfeited, but it had an incentive to litigate those issues in order to ensure that Castro received punishment commensurate to his offense.[9] Accordingly, the Government's shifting incentives did not affect the fairness of its opportunity to litigate the source and intended use of the currency.

██ Nevertheless, concerns regarding the fairness of estoppel also arise where the subsequent proceeding offers "procedural opportunities unavailable in the first action that could readily cause a different result." *Monarch*, 192 F.3d at 304. Here, procedural mechanisms crucial to the Government's ability to gather probative evidence in the civil forfeiture action were either not available, or were available to a lesser degree, in the sentencing proceedings. As a result of the significant variance between the procedural opportunities available at Castro's sentencing and those available in the forfeiture action, the Government lacked a sufficiently "fair" opportunity to litigate the relevant issues in the prior proceeding.

The most striking of these procedural differences involves what would likely be the most probative evidence of the source and intended use of the currency: the sworn testimony of Castro himself. In the criminal proceedings, the Government could not have compelled Castro's testimony, even at an evidentiary hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir.1978), and the District Court could not have drawn an adverse inference if Castro invoked his Fifth Amendment rights and refused to testify at such a hearing. *See* U.S. CONST. amend. V; *Mitchell v. United States*, 526 U.S. 314, 321–30, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999). In contrast, in the forfeiture action, the Government would be able to take the sworn deposition testimony of both Castro and Ansueto (regardless of whether

---

**9.** The claimants contend that the Government had an incentive, and possibly an ethical duty, to litigate the source of the currency in order to ensure that the District Court be presented with an appropriate plea agreement. Subsection 6B1.2(a) of the 1995 Guidelines provides that a court may accept a plea agreement if it is satisfied "that the remaining charges adequately reflect the seriousness of the actual offense behavior." Here, the statutory offense to which Castro pled—a violation of 31 U.S.C. § 5316—applies to currency non-reporting regardless of the source of the currency. The source becomes relevant only for sentencing. *See* 1995 Guidelines § 2S1.3(b). Therefore, the charge to which Castro pled properly encompasses his offense behavior.

they later testify at trial). *See* Fed. R.Civ.P. 30. And if Castro or Ansueto exercise their Fifth Amendment rights in the forfeiture action, the Government may be able to obtain an adverse inference based on their refusal to testify. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997) (adverse inference permitted in civil action even when "the government is a party to the action and would benefit from the drawing of the inference"); *cf. United States v. Certain Real Property & Premises Known as 4003–4005 5th Ave., Brooklyn, N.Y.,* 55 F.3d 78, 82–84 (2d Cir. 1995) (in forfeiture action, adverse inference is available but Fifth Amendment concerns are heightened).

The Government's ability to litigate the source and intended use of the currency was further hampered by the limited discovery available in criminal cases. In a civil forfeiture action, the Government has recourse to the full array of civil discovery procedures against the defendant, including interrogatories, requests for admissions, document requests, depositions, and so forth. In contrast, in a criminal case, the Government is entitled to discovery of documents and tangible objects from the defendant only if the defendant seeks reciprocal discovery from the Government, and only of such material "which the defendant intends to introduce as evidence in

chief at the trial." Fed.R.Crim.P. 16(b)(1)(A). Given the limitations of Rule 16, the Government was unable to obtain evidence crucial to its case from Castro, including any documentary evidence in Castro's possession relating to the terms of Ansueto's alleged loan to Castro, the intended use of the loan proceeds, and the method by which the loan proceeds were converted to United States currency and transferred to Castro. Also, the Federal Rules of Evidence, which did not constrain the District Court at sentencing, *see Monarch,* 192 F.3d at 305, would apply in the civil forfeiture action. The Government could rely on those rules to challenge the admissibility of the financial records and other documents submitted by Castro to the Probation Department to support his version of events.[10] There may be situations in which a district court could exercise its discretion to order a broad evidentiary hearing on a sentencing issue, *see United States v. Prescott,* 920 F.2d 139, 143–44 (2d Cir.1990), and thereby allow both sides to present all available probative evidence on the disputed issue. In the present case, however, an evidentiary hearing would not have remedied the Government's procedural disadvantages, because the Government still would have been precluded from obtaining probative testimonial and documentary evidence from Castro. In sum, because of the differences in the procedural opportunities available in Castro's criminal proceedings and in the forfeiture action, the Government lacked a sufficiently fair opportunity to

**10.** The claimants insist that many, if not all, of these procedural opportunities were voluntarily surrendered by the parties by signing the plea agreement. But regardless of whether the case had proceeded to trial or been resolved by a guilty plea (possibly followed by a *Fatico* hearing), the procedural opportunities in the criminal proceeding would have been limited relative to those available in the

civil action. For example, the Government would have been barred by the Fifth Amendment from compelling Castro's testimony or obtaining an adverse inference based on a refusal to testify, regardless of whether Castro pled guilty. *See Mitchell,* 526 U.S. at 321–30, 119 S.Ct. 1307. Also, as we have discussed, criminal discovery is much more limited than civil discovery.

litigate the source and intended use of the currency.

## B. "Actual Litigation"

Our consideration of the fairness of applying collateral estoppel also requires us to examine whether the parties "actually litigated" the source and intended use of the currency. *See Boguslavsky,* 159 F.3d at 720. The parties do not dispute that the District Court, at Castro's sentencing, actually decided that the currency in question was derived from a lawful source and was intended to be used for a lawful purpose. But the parties disagree as to whether the issues of source and intended use were actually litigated in the criminal proceedings—specifically, whether the parties' execution of the plea agreement and their discussion with the District Court at sentencing establish that they actually litigated the issues.

█ The claimants contend that the Government is collaterally estopped from re-litigating a fact established by the plea agreement. *Cf. Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa, S.A.,* 56 F.3d 359, 369 n. 4 (2d Cir.1995) (holding that, if the parties intended to be bound by a prior stipulation, the issue that is the subject of the stipulation may be deemed to have been "actually litigated" for collateral estoppel purposes). We need not reach this question, however, as the plea agreement contains no stipulation regarding the source or intended use, legal or otherwise, of the seized currency. The agreement simply provides that Castro will plead guilty to a violation of the currency reporting law, 31 U.S.C. § 5316, which applies to all such violations regardless of the source of the funds. The agreement further states the Government's position that the relevant base offense level is determined under subsection 2S1.3(a) of the 1995 Guidelines and is level six. Subsection 2S1.3(a) is the general guideline for currency reporting offenses, and itself contains no reference to the source of the funds. The plea agreement makes no mention of subsection 2S1.3(b)(1), which enhances the base offense level if the funds are derived from an unlawful source, or subsection 2S1.3(b)(2), the 1995 Guidelines section ultimately relied upon by the District Court in sentencing, which provides for an offense level of six if the source and intended use of the funds are lawful. If the Government had stated in the agreement that subsection 2S1.3(b)(1) or (b)(2) should apply to Castro's offense, one might argue that the Government had implicitly taken a position on the source or intended use of the currency. However, the Government made no such statement. Given the absence of any reference in the agreement to the source or intended use of the currency, or anything else in the record to suggest that these issues were contested or even considered during the plea negotiations, we find that the negotiation and execution of the plea agreement established nothing about either the source or the intended use of the currency.

Furthermore, by its terms, the plea agreement "does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability or forfeiture of assets." This "reservation of rights" by the Government would seem incongruous if, as the claimants assert, the Government had implicitly conceded in the same document that the currency was from a lawful source.[11] More generally, the inclusion of

11. This seeming incongruity is somewhat

muted by the fact that when the plea agree-

the "reservation of rights" clause indicates that future forfeiture litigation was foreseen, or at least contemplated, by both parties.

The claimants also assert that the source and intended use of the currency were "actually litigated" at the sentencing hearing. Those issues were presented to the parties and the District Court in the PSR, which set forth a sentencing recommendation based in part on a finding that "[t]he defendant has provided proof that the funds were the proceeds of lawful activity, and they were to be used for a lawful purpose." At the hearing, Castro's counsel referred to the PSR's findings, arguing that "there was [*sic*] no illegal proceeds involved in this case, and the funds were not to be used for anything improper." The District Court then asked, "Does the government have any position on that at this point or not?" The Government stated that it did not have a position. That the issues of source and intended use were raised by the PSR, addressed by one party, and made the subject of inquiry by the District Court strongly suggests that those issues were "actually litigated" for purposes of collateral estoppel despite the Government's failure to take a position. However, the Government's silence appears to have been neither strategic nor abusive: under the terms of the plea agreement, the Government effectively was constrained from arguing in favor of a higher Guidelines range, which would have been the necessary implication of any argument that the currency was derived from an illegal source or intended for an illegal use. In

the end, we need not resolve this conundrum, given our finding that in this case the Government lacked a full and fair opportunity to litigate the source and intended use of the currency.

## IV. Other Issues

In light of our holding that the District Court erred in giving preclusive effect in the forfeiture proceedings to its sentencing findings, we also need not address the District Court's finding that forfeiture of the currency would violate the "excessive fines" clause of the Eighth Amendment. That finding by the District Court was predicated on its determination that the source and intended use of the currency were lawful, matters which now will be the subject of renewed litigation in the forfeiture action. Nor, at this point, may we address the claimants' contention that they are entitled to pre-judgment interest.

CONCLUSION

Because the Government lacked a full and fair opportunity to litigate the source and intended use of the currency, the claimants cannot overcome *Monarch's* presumption against the application of collateral estoppel in these circumstances. We conclude, therefore, that the District Court erred in giving preclusive effect in the forfeiture action to its findings at Castro's sentencing. We vacate the judgment of the District Court and remand for further proceedings consistent with this opinion.

ment was signed, the Supreme Court had not yet decided *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), which cast doubt on the possibility that funds with no connection to unlawful activity could be subject to forfeiture. In other words, if the Government had believed,

pre-*Bajakajian*, that it could win forfeiture of the currency even if it was derived from a lawful source or intended for a lawful use, then it would have mattered little to the Government whether it made any concessions regarding the source or intended use.