William M. HOBLOCK, Candidate for Albany County Legislator for the 26th District, and Lee R. Carman, Candidate for Albany County Legislator for the 29th District, Plaintiffs–Appellees–Cross–Appellants,

Philip Sgarlata, Patricia Sgarlata, John Stewart, Carol Stewart, Mary Maybee and Ellen Graziano, and other voters similarly situated, Plaintiffs–Appellees,

v.

The ALBANY COUNTY BOARD OF ELECTIONS, Defendant–Appellant–Cross–Appellee,

Richard A. Gross, Candidate for Albany County Legislator for the 26th District, and Gene Messercola, Candidate for Albany County Legislator for the 29th District, Defendants.

Docket Nos. 04–5876–CV(L), 04–5993–CV(XAP).

United States Court of Appeals, Second Circuit.

Argued March 3, 2005.

Decided Sept. 2, 2005.

Tom Marcelle, Albany, New York, for Plaintiffs–Appellees.

Michael C. Lynch, Albany County Attorney's Office, Albany, New York, for Defendant–Appellant.

Before: WALKER, Chief Judge, CARDAMONE and B.D. PARKER, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

Because of litigation in state and federal courts, winners have yet to be declared in an election for two seats in the Albany County, New York, Legislature first scheduled for November 2003 and not held until April 2004. Appellant, the Albany County Board of Elections, would like to

declare the winners, and the New York Court of Appeals has instructed the Board to exclude certain absentee ballots in doing so. Appellee voters, along with two candidates who have since dropped out of the case, argued in the district court (Lawrence E. Kahn, *Judge* ) that their constitutional rights would be violated if the Board certified the election results without counting the disputed absentee ballots, and the district court preliminarily enjoined the Board from certifying the election results.

The Board argues that under the *Rooker–Feldman* doctrine, the district court should have dismissed the voters' suit for lack of subject-matter jurisdiction in light of earlier state-court litigation over the absentee ballots. The Board also contends that state-law principles of claim and issue preclusion require dismissal of the voters' suit.[1] Alternatively, the Board asserts that on the merits, this court should vacate the district court's preliminary injunction because the voters have not sufficiently established that their constitutional claim is likely to succeed. Although we are unpersuaded by the Board's arguments, we remand the case to the district court for further proceedings and leave the preliminary injunction in place.

## I. BACKGROUND

This appeal is the latest installment in litigation that began in 2003 over elections for the Albany County Legislature. In August 2003, ruling on a challenge brought by voters and the NAACP, the United States District Court for the Northern District of New York held that Albany County's redistricting plan for the then-upcoming November 2003 election likely violated the federal Voting Rights Act, 42 U.S.C. § 1973. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany (Arbor Hill I )*, 281 F.Supp.2d 436, 456–57 (N.D.N.Y.2003). Although the district court ultimately approved a substitute redistricting plan, by then it was too late to hold the November 2003 election in accordance with the substitute plan, and the district court declined to order a special election. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany (Arbor Hill II )*, 289 F.Supp.2d 269, 276–77 (N.D.N.Y.2003); *see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany (Arbor Hill III )*, 357 F.3d 260, 262 (2d Cir.2004) (per curiam). On appeal, this court partially reversed the district court's decision and ordered that a special primary election be held in March 2004 and that a special general election be held thereafter on a schedule and subject to procedures to be established by the district court on remand. *Arbor Hill III*, 357 F.3d at 263.

As directed by the district court on remand, the Albany County Board of Elections issued absentee ballots for the March 2004 special primary to voters who had requested absentee ballots for the originally scheduled Fall 2003 general or primary elections. The Board also issued absentee ballots for the special general election, scheduled for April 27, 2004, to those same voters. *Gross v. Albany County Bd. of Elections (Gross III )*, 3 N.Y.3d 251, 785 N.Y.S.2d 729, 819 N.E.2d 197, 198 (N.Y. 2004) (per curiam). The district court,

---

1. The Board's opening brief does not clearly distinguish between the two different types of preclusion. Because the district court ruled that neither claim nor issue preclusion foreclosed the voters' suit, *Hoblock v. Albany County Bd. of Elections*, 341 F.Supp.2d 169, 173–74 (N.D.N.Y.2004), and because the Board's brief challenges the substance of the Board's issue-preclusion ruling by asserting that the state court addressed the voters' constitutional claims, we construe the Board's brief as challenging the district court's ruling as to both claim and issue preclusion.

however, had directed that ballots for the special general election be issued in accordance with Article 8 of the New York Election Law, which would have required voters to file a new request for such ballots. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, No. 03 CV 502, slip op. at 6–7 (N.D.N.Y. Feb. 2, 2004); N.Y. Elec. Law § 8–400. Contrary to Article 8's requirement, the Board issued the special-general-election ballots, as it had issued the special-primary-election ballots, without the voters' having filed a new request for absentee ballots.

The absentee ballots for the April 2004 special general election could determine the election to two seats in the Albany County Legislature. Candidates Hoblock, a Republican, and Gross, a Democrat, vied for the 26th District seat; candidates Carman, a Republican, and Messercola, a Democrat, contested the 29th District seat. After the machine count of votes (not including absentee ballots), the election was close: according to the complaint, Hoblock led Gross by three votes, while Messercola led Carman by four votes. On May 5, 2004, when the Board of Elections convened to hand count the absentee ballots, all four candidates raised various challenges. The Board then decided to postpone counting those ballots until a state court ruled on their validity.

All four candidates petitioned the New York Supreme Court in Albany County to have various absentee ballots invalidated; the Board opposed the petition.[2] The state court's opinion reveals that the candidates challenged a total of 83 absentee ballots (Carman challenged 18, Gross 24, Hoblock 16, and Messercola 25). Of the 83 ballots, 40 were challenged on the basis that the Board improperly issued them based on a November 2003 absentee-ballot application and 43 were challenged on other grounds. Of these 43 ballots, the state court invalidated 6 but held 37 to be valid; none of them is at issue in the current litigation.

The state court held that the 40 ballots issued based on November 2003 absentee-ballot applications were invalid because they were issued in violation of the district court's order and Article 8 of the New York Election Law. *See Gross v. Albany County Bd. of Elections (Gross I )*, No. 2703–04, slip op. at 4–5 (N.Y. Sup.Ct. June 1, 2004). The Appellate Division, with two judges dissenting, affirmed on the same grounds. *Gross v. Albany County Bd. of Elections (Gross II )*, 10 A.D.3d 476, 781 N.Y.S.2d 172, 174 (App.Div.2004) (per curiam); *see id.* at 176–77 (Spain, J., joined by Carpinello, J., concurring in part and dissenting in part). On October 14, 2004, the New York Court of Appeals affirmed the Appellate Division's decision, again for the reasons relied on by the trial court and again with two judges dissenting. *Gross III*, 785 N.Y.S.2d 729, 819 N.E.2d at 202–03; *id.* at 203–06 (Rosenblatt, J., joined by R.S. Smith, J., dissenting).

Having lost in state court, candidates Hoblock and Carman sued in federal district court along with seven voters (who claim to sue on behalf of other similarly situated voters).[3] The plaintiff voters and

---

**2.** It appears from the New York Supreme Court's opinion that candidates Hoblock and Carman changed their position during the state-court litigation, first petitioning for the invalidation of certain ballots and later arguing that they should be counted. The state court disregarded the attempted position change and ruled upon the challenges set forth in Hoblock and Carman's initial petition. *Gross v. Albany County Bd. of Elections (Gross I )*, No. 2703–04, slip op. at 3 (N.Y. Sup.Ct. June 1, 2004).

**3.** It may seem strange that Hoblock, who was ahead of his opponents by three votes based

candidates claimed, under 42 U.S.C. § 1983, that the Board's refusal to tally the challenged absentee ballots violated their rights under the Fourteenth Amendment's due-process and equal-protection clauses. The district court dismissed the claims of Hoblock and Carman, *see Hoblock v. Albany County Bd. of Elections*, 341 F.Supp.2d 169, 178 (N.D.N.Y.2004), and they have not appealed the dismissal. The district court also preliminarily enjoined the Board from certifying the election results without tallying the challenged absentee ballots. *Id.* The Board has now appealed the district court's order granting the preliminary injunction; the district court has yet to rule on the merits of the voters' § 1983 claim.

## II. DISCUSSION

### A. The *Rooker–Feldman* question

█ Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker–Feldman* doctrine in certain circumstances. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 4469.1 (2002). The district court raised *Rooker–Feldman* sua sponte and determined that the doctrine barred the claims of candidates Hoblock and Carman, but not those of the voters. *Hoblock*, 341 F.Supp.2d at 172–75. Hoblock and Carman abandoned their appeal, so we do not consider whether the district court properly dismissed their claims. We

must, however, consider the Board's argument that the district court should have also dismissed the voters' claims on *Rooker–Feldman* grounds. Because *Rooker–Feldman* goes to subject-matter jurisdiction, we review de novo the district court's application of the doctrine. *Rivers v. McLeod*, 252 F.3d 99, 101 (2d Cir.2001) (per curiam).

The Supreme Court's recent decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. ——, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005), examined the *Rooker–Feldman* doctrine as it has been applied by the lower federal courts. *Exxon Mobil* thus requires us not only to evaluate how the district court applied *Rooker–Feldman*, but also to examine anew the doctrine itself.

The Supreme Court has applied the *Rooker–Feldman* doctrine to defeat federal subject-matter jurisdiction exactly twice, in the two cases for which the doctrine is named. *See id.* at ——, 125 S.Ct. at 1521. In *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 414–15, 44 S.Ct. 149, 68 L.Ed. 362 (1923), the Court held that a federal district court lacked jurisdiction over a suit to have a state-court decision "declared null and void" on grounds that it violated the Constitution. The Court explained that because "[t]he jurisdiction possessed by the District Courts is strictly original" under the statutes governing the federal judiciary, the district court could not hear the suit. *Id.* at 416, 44 S.Ct. 149. "To do

on the machine count, joined Carman, who was behind by four votes, in suing in federal court. Based on our reading of the state trial court's decision, however, it looks like Hoblock's opponent Gross may stand to pick up an additional four votes out of the 43 absentee ballots that were challenged on grounds other than having been issued based on 2003 absentee-ballot applications. Hoblock challenged 13 ballots that were held valid; Gross challenged 9 that were held valid. If each candi-

date challenged only the ballots of voters whom they expected to vote for their opponents, then Hoblock's three-vote lead could be canceled out by the four net votes for Gross contained in the absentee ballots that are not the subject of this suit. Hoblock would thus have had an incentive to try to get the absentee ballots counted that are the subject of this suit if he expected them to yield four or more net votes in his favor.

so would be an exercise of appellate jurisdiction," which only the Supreme Court possesses over state-court judgments. *Id.*

Sixty years later, in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), a suit brought by disappointed applicants for the D.C. bar challenging the decision of the District of Columbia's highest court refusing to admit them to the bar, the Court held that a federal district court lacked jurisdiction over some of the applicants' claims but not over others. Noting that a federal district court "has no authority to review final judgments of a state court in judicial proceedings," *id.* at 482, 103 S.Ct. 1303, the Court held that to the extent that the applicants challenged the D.C. court's decision, in their particular case, to deny them admission to the bar by refusing to waive certain bar-admission requirements, the challenge could not proceed in federal court, *id.* at 482–83, 103 S.Ct. 1303. But to the extent that the applicants challenged the bar-admission rules themselves—rules promulgated by the D.C. court "in a nonjudicial capacity," *id.* at 485, 103 S.Ct. 1303—the applicants' suit was not barred, because such a challenge "do[es] not require review of a final state-court judgment in a particular case," *id.* at 486, 103 S.Ct. 1303.

*Rooker* and *Feldman* thus established the clear principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments; but the two cases provided little guidance on how to apply that principle. Nor, until *Exxon Mobil*, did other Supreme Court cases offer much assistance. "The few [pre-*Exxon Mobil*] decisions that have mentioned *Rooker* and *Feldman* have done so only in passing or to explain why those cases did not dictate dismissal." *Exxon Mobil*, 544 U.S. at ——, 125 S.Ct. at 1523; *see also id.* at ——, 125 S.Ct. at 1523–24 (collecting cases).

Lower federal courts have struggled to define *Rooker–Feldman*'s reach. Some courts, including the Seventh and Ninth Circuits, have interpreted the doctrine narrowly. *See, e.g., Noel v. Hall*, 341 F.3d 1148, 1163–65 (9th Cir.2003); *GASH Assocs. v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir.1993). Others, including this circuit, have applied *Rooker–Feldman* expansively: we held in *Moccio v. New York State Office of Court Administration*, 95 F.3d 195, 199–200 (2d Cir.1996), that *Rooker–Feldman* was effectively coextensive with doctrines of claim and issue preclusion. *See also Charchenko v. City of Stillwater*, 47 F.3d 981, 983 n. 1 (8th Cir.1995) ("We note that *Rooker–Feldman* is broader than claim and issue preclusion because it does not depend on a final judgment on the merits. Aside from this distinction the doctrines are extremely similar."). *Moccio* relied for this conclusion on the following statement from a footnote in *Feldman:*

> If the constitutional claims presented to a United States district court are *inextricably intertwined* with the state court's denial in a judicial proceeding of a particular plaintiff's application for admission to the state bar, then the district court is in essence being called upon to review the state-court decision. This the district court may not do.

460 U.S. at 483–84 n. 16, 103 S.Ct. 1303 (emphasis added). Interpreting this language, *Moccio* held that "the Supreme Court's use of 'inextricably intertwined' means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding ... subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion." 95 F.3d at 199–200.

The district court in this case, relying on *Moccio*, analyzed the *Rooker–Feldman* question solely in terms of claim and issue preclusion. Finding that neither type of preclusion applied to the voters' suit, the district court held that *Rooker–Feldman* did not deprive it of subject-matter jurisdiction. *Hoblock*, 341 F.Supp.2d at 173. The Supreme Court has now told us that *Moccio* (and, by extension, the district court's analysis based on *Moccio*) was incorrect. Indeed, the Supreme Court cited *Moccio* as an example of a case that wrongly construed the *Rooker–Feldman* doctrine "to extend far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress'[s] conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." *Exxon Mobil*, 544 U.S. at ––––, 125 S.Ct. at 1521. *Exxon Mobil* teaches that *Rooker–Feldman* and preclusion are entirely separate doctrines.

■ In *Exxon Mobil*, the Supreme Court pared back the *Rooker–Feldman* doctrine to its core, holding that it "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." 544 U.S. at ––––, 125 S.Ct. at

1521–22. From this holding, we can see that there are four requirements for the application of *Rooker–Feldman*. First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." [4] Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive.

### 1. The substantive *Rooker–Feldman* requirements

Underlying the *Rooker–Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions.[5] That principle animates the two substantive requirements for *Rooker–Feldman*'s application outlined in *Exxon Mobil*: 1) the federal plaintiff must complain of injury from a state-court judgment; and 2) the federal plaintiff must seek federal-court review and rejection of the state-court judgment.

---

**4.** One could argue that these second and third requirements are not distinct—i.e., that to complain of injuries caused by a state-court judgment is necessarily to invite review and rejection of that judgment. The Court's shorthand description of *Rooker* and *Feldman* as cases in which "loser in state court invites federal district court to overturn state-court judgment," *Exxon Mobil*, 544 U.S. at –––– n. 2, 125 S.Ct. at 1524 n. 2, supports such an argument: the single phrase "invites federal district court to overturn state-court judg-

ment" seems to capture the ideas of both complaining about injuries caused by the judgment and seeking its review and rejection. We believe, however, that conceiving these as two separate requirements makes *Rooker–Feldman*'s contours easier to identify.

**5.** We recognize that habeas corpus review is an exception to this principle, but because of the limited scope of habeas, we will not discuss it further.

*Exxon Mobil* declares these requirements but scarcely elaborates on what they might mean. The Court does, however, give some negative guidance as to what cases are *not* captured by the requirements. The Court points out that 28 U.S.C. § 1257 (and thus *Rooker–Feldman*) does not deprive a district court of subject-matter jurisdiction

> simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."

544 U.S. at ——, 125 S.Ct. at 1527 (quoting *GASH Assocs.*, 995 F.2d at 728; alterations in *Exxon Mobil*). This language describes a set of federal suits—those raising "independent claims"—that are outside *Rooker–Feldman*'s compass even if they involve the identical subject matter and parties as previous state-court suits.

The voters' federal suit is therefore barred by *Rooker–Feldman* only if it complains of injury from the state-court judgment and seeks review and rejection of that judgment, but not if it raises "some independent claim." How do we determine whether a federal suit raises an independent, non-barred claim? At first glance, one might think that a federal claim is independent of claims raised in state court if the federal claim is premised on a theory not passed upon by the state court. Indeed, the voters make essentially this argument, asserting that *Rooker–Feldman* does not apply because the voters raise a Fourteenth Amendment argument and thus "are not seeking review of the state court's decision[,] which was strictly limited to state law . . . ."

█ Just presenting in federal court a legal theory not raised in state court, however, cannot insulate a federal plaintiff's suit from *Rooker–Feldman* if the federal suit nonetheless complains of injury from a state-court judgment and seeks to have that state-court judgment reversed. *Feldman* itself makes this plain. Prior to *Feldman*, the Fifth Circuit held in *Dasher v. Supreme Court of Texas*, 658 F.2d 1045, 1051 (5th Cir.1981), that a federal district court had subject-matter jurisdiction, notwithstanding 28 U.S.C. § 1257, to hear a plaintiff's constitutional challenge to a state-court judgment denying the plaintiff admission to the state bar, provided the state court had not passed on the constitutional issues raised in the federal suit. The Court took pains in *Feldman* to explain that *Dasher* was wrong: such federal constitutional claims, even if not raised in state court, are "inextricably intertwined" with the challenged state-court judgment denying bar admission, and therefore a federal district court lacks jurisdiction over such claims because "the district court is in essence being called upon to review the state-court decision." *Feldman*, 460 U.S. at 483–84 n. 16, 103 S.Ct. 1303.

The "inextricably intertwined" language from *Feldman* led lower federal courts, including this court in *Moccio*, 95 F.3d at 199–200, to apply *Rooker–Feldman* too broadly. In light of *Exxon Mobil*—which quotes *Feldman*'s use of the phrase but does not otherwise explicate or employ it, 544 U.S. at ——, 125 S.Ct. at 1523 & n. 1—it appears that describing a federal claim as "inextricably intertwined" with a state-court judgment only states a conclusion. *Rooker–Feldman* bars a federal claim, whether or not raised in state court, that asserts injury based on a state judgment and seeks review and reversal of that judgment; such a claim is "inextricably

intertwined" with the state judgment. But the phrase "inextricably intertwined" has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil.*

Are the voters' federal constitutional claims independent of the state-court judgment, or does the voters' federal suit assert injury based on a state judgment and seek review and reversal of that judgment (i.e., are the voters' federal claims "inextricably intertwined" with the state judgment)? We begin by asking whether the voters' suit seeks "review and reversal" of the state-court judgment. In one sense, no: the voters do not want the federal court to evaluate the state court's reasoning (i.e., the federal court need not "review" the substance of the state-court judgment). But we know, as explained above, that a federal suit is not free from *Rooker–Feldman*'s bar simply because the suit proceeds on legal theories not addressed in state court.

More importantly, even if what the voters seek in federal court is not "review" in some sense, the voters *do* seem to seek reversal: the state court ordered the Board not to count the voters' ballots, and the voters want the federal court to order the Board to count the ballots. Because the Board cannot comply with both the state-court order and the desired federal-court order, the federal-court order, if granted, would seem to "reverse" the state-court judgment.

On the other hand, we know that an "independent" (and therefore non-barred) claim may " 'den[y] a legal conclusion' " reached by the state court. *Exxon Mobil,* 544 U.S. at ——, 125 S.Ct. at 1527 (quoting *GASH Assocs.,* 995 F.2d at 728). Precisely what this means is not clear from either *Exxon Mobil* or *GASH Associates* (the original source of the language), but it

suggests that a plaintiff who seeks in federal court a result opposed to the one he achieved in state court does not, for that reason alone, run afoul of *Rooker–Feldman.*

The key to resolving this uncertainty lies in the second substantive *Rooker–Feldman* requirement: that federal plaintiffs are not subject to the *Rooker–Feldman* bar unless they *complain of an injury* caused by a state judgment. Indeed, this is the core requirement from which the others derive; focusing on it helps clarify when the doctrine applies.

First, this requirement explains why a federal plaintiff cannot escape the *Rooker–Feldman* bar simply by relying on a legal theory not raised in state court. Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments.

Further, by focusing on the requirement that the state-court judgment be the source of the injury, we can see how a suit asking a federal court to "den[y] a legal conclusion" reached by a state court could nonetheless be independent for *Rooker–Feldman* purposes. Suppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses. If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he

will not be alleging injury from the state judgment. Instead, he will be alleging injury based on the employer's discrimination. The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker–Feldman*, of the state-court judgment.[6]

The voters' claims in this case seem at first to complain only of the Board's refusal to tally their votes rather than of any injury caused by the state court's judgment. Matters are complicated, however, by the fact that in refusing to tally the votes, the Board is acting under compulsion of a state-court order. Can a federal plaintiff avoid *Rooker–Feldman* simply by clever pleading—by alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself? Surely not. In the child-custody example given above, if the state has taken custody of a child pursuant to a state judgment, the parent cannot escape *Rooker–Feldman* simply by alleging in federal court that he was injured by the state employees who took his child rather than by the judgment authorizing them to take the child. The example shows that in some circumstances, federal suits that purport to complain of injury by individuals in reality complain of injury by state-court judgments. The challenge is to identify such suits.

 The following formula guides our inquiry: a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it. Where a state-court judgment causes the challenged third-party action, any challenge to that third-party action is necessarily the kind of challenge to the state judgment that only the Supreme Court can hear. This formula dovetails with the *Rooker–Feldman* requirement about timing that we have termed "procedural," i.e., the requirement that the federal suit be initiated after the challenged state judgment. If federal suits cannot be barred by *Rooker–Feldman* unless they complain of injuries produced by state-court judgments, it follows that no federal suit that precedes a state-court judgment will be barred; the injury such a federal suit seeks to remedy cannot have been produced by a state-court judgment that did not exist at the federal suit's inception.

 Applying this formula, we find that the voters' federal suit does complain of an injury caused by the state-court judgment and seek that judgment's reversal. It thus meets *Rooker–Feldman*'s substantive requirements. In determining that the voters' injury was produced by the state-court judgment directing the Board not to count their ballots, rather than by the Board's action in refusing to count their ballots, we look at both the allegations in the voters' federal complaint and the records of the state-court proceedings.

The allegations in the voters' complaint are somewhat ambiguous as to whether the injury they seek to have remedied— the Board's refusal to count their ballots— preceded, and thus was not produced by, a state-court decision. While the Board was canvassing the ballots, various candidates objected to the counting of certain absentee ballots. The Board decided not to count ballots to which objections were lodged. The wording of the complaint suggests that the Board intended to shunt

---

**6.** The subsequent federal suit could, of course, be barred by ordinary preclusion principles. *See Exxon Mobil,* 544 U.S. at ——, 125 S.Ct. at 1527.

responsibility for deciding which ballots to count to the state court: the voters allege that "[b]y agreement, the Board of Elections did not open the absentee ballots until the State Court could rule on them." Compl. at ¶ 39.

The state trial court's opinion, however, makes plain that the Board, had it been left to its own devices, would have counted the 40 absentee ballots issued based on November 2003 absentee-ballot applications. *Gross I*, slip op. at 3. The Board argued in state court that the ballots were valid and should be counted, and but for the state court's judgment ordering the Board not to do so, the Board would have counted the challenged absentee ballots. The state-court judgment did not ratify, acquiesce in, or leave unpunished an anterior decision by the Board not to count the ballots. Instead, the state-court judgment produced the Board's refusal to count the ballots, the very injury of which the voters complain. Whether *Rooker–Feldman* bars the voters' federal suit therefore turns on whether their suit meets the remaining procedural requirements pertaining to timing and party identity outlined in *Exxon Mobil*.

### 2. The procedural *Rooker–Feldman* requirements

*Rooker–Feldman* does not automatically bar every federal suit that seeks review and rejection of an injury-creating state decision. Instead, such federal suits must meet two further requirements, which we have termed "procedural," imposed by *Exxon Mobil*: 1) the federal suit must follow the state judgment; and 2) the parties in the state and federal suits must be the same. 544 U.S. at ——, 125 S.Ct. at 1521–22.

▪ The timing requirement will usually be straightforward, although federal suits challenging interlocutory state judg-

ments may present difficult questions as to whether "the state proceedings have 'ended' within the meaning of *Rooker–Feldman* on the federal questions at issue." *Federacion de Maestros de P.R. v. Junta de Relaciones del Trabajo de P.R.*, 410 F.3d 17 (1st Cir. May 27, 2005), 2005 U.S.App. LEXIS 9748, at *20 (quoting *Exxon Mobil*, 125 S.Ct. at 1526) (discussing this question). More commonly, however, the federal suit will come after the state suit has unequivocally terminated, as in this case: the New York Court of Appeals decided on October 14, 2004, that the contested ballots should not be counted, *Gross III*, 785 N.Y.S.2d 729, 819 N.E.2d at 197, 199, and the plaintiffs filed suit in federal district court on October 19, 2004, *Hoblock*, 341 F.Supp.2d at 172.

The second requirement, common identity between the state and federal plaintiffs, will also often be straightforward, as when the federal plaintiff was a named party in the state lawsuit. In this case, however, whether the party-identity requirement is met is not obvious. Candidates Hoblock and Carman were plainly parties in state court, but they have abandoned their appeal. We are left with the question whether the voters, despite not having appeared in state court, should nonetheless be considered state-court losers for *Rooker–Feldman* purposes.

▪ Because *Rooker–Feldman* is a doctrine of federal subject-matter jurisdiction, we must look to federal law to determine whether the voters should be treated, for *Rooker–Feldman* purposes, as if they were parties to the candidates' state-court suit. *See* Suzanna Sherry, *Judicial Federalism in the Trenches: The* Rooker–Feldman *Doctrine in Action*, 74 Notre Dame L.Rev. 1085, 1101 (1999); *see also* David P. Currie, *Res Judicata: The Neglected Defense*, 45 U. Chi. L.Rev. 317, 324 (1978) ("*Rooker* thus provides for a limited, uni-

form federal law of preclusion in cases that varying state laws may not foreclose."). While we recognize that claim and issue preclusion are distinct from the *Rooker–Feldman* doctrine, we believe that federal case law governing the application of preclusion doctrines to nonparties should guide the analogous inquiry in the *Rooker–Feldman* context.[7]

In *Montana v. United States*, 440 U.S. 147, 154 n. 5, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), the Court seemed to discourage using the term "privity" to describe the relationship between nonparties who "assume control over litigation in which they have a direct financial or proprietary interest" and are therefore subject to issue preclusion based on the results of litigation that they controlled. Subsequently, however, the Court has used the term "privity" in discussing the principles according to which a nonparty may be bound by an earlier judgment. *Richards v. Jefferson County*, 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996).

Following *Richards*, we think that the party-identity question in this case may be posed this way: is there sufficient privity, as a matter of federal law, between the voters and the candidates that the voters should be considered parties to, and bound by, the candidates' state lawsuit against the Board? The Supreme Court has explained that a nonparty can be bound by the results of someone else's litigation "when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." *Martin v. Wilks*, 490 U.S. 755, 762 n. 2, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *see also Richards*, 517 U.S. at 798–99, 116 S.Ct. 1761 (quoting *Wilks* ). *Wilks*

provided two examples of such "limited circumstances": 1) where the first suit was brought by a class representative and the second suit was brought by a class member, as discussed in *Hansberry v. Lee*, 311 U.S. 32, 41–42, 61 S.Ct. 115, 85 L.Ed. 22 (1940); and 2) where the second suit was brought by a party who actually controlled, without being a party to, the first suit, as discussed in *Montana*, 440 U.S. at 154–55, 99 S.Ct. 970. *Wilks*, 490 U.S. at 762 n. 2, 109 S.Ct. 2180.

Some lower federal courts have expansively interpreted the concept of privity under federal law to reach beyond the "limited circumstances" discussed in *Wilks*. Under the so-called doctrine of virtual representation, "a person may be bound by a judgment even though not a party if one of the parties to the suit is *so* closely aligned with his interests as to be his virtual representative." *Aerojet–Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.1975). We have endorsed this doctrine, observing that claim preclusion "may bar non-parties to earlier litigation . . . when the interests involved in the prior litigation are virtually identical to those in later litigation." *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir.1995). The virtual-representation doctrine is controversial, however, and the Seventh Circuit has sharply criticized it. *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 970–73 (7th Cir.1998); *see also* 18A Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d § 4457 (2002).

We need not determine whether the Supreme Court's discussion of privity in *Richards*, which postdates both *Aerojet–General* and *Chase Manhattan Bank*, un-

---

**7.** As we note below, however, in determining whether state-law preclusion principles may independently bar a federal suit, we look to state-law definitions of privity. *See, e.g., Ferris v. Cuevas*, 118 F.3d 122, 126–27 (2d Cir. 1997).

dermines the virtual-representation doctrine, for even under that doctrine, which gives privity its broadest scope under federal law, the candidates did not virtually represent the interests of the voters when the candidates sued the Board in state court. As a general matter, in an election contest the interests of candidates (who seek to be elected) and the interests of voters (who seek to have their votes counted) may overlap, but they are not necessarily "virtually identical" to each other, as *Chase Manhattan Bank* requires for the virtual-representation doctrine to apply. *See Schulz v. Williams*, 44 F.3d 48, 54 (2d Cir.1994); *Tarpley v. Salerno*, 803 F.2d 57, 60 (2d Cir.1986). In this case in particular, the candidates' initial position in the state litigation was directly hostile to the interests of some voters in having their votes counted: the candidates sought to have certain absentee ballots declared invalid. Given that the state court disregarded the candidates' subsequent attempt to argue in favor of counting disputed ballots and instead ruled on the candidates' initial challenges, the candidates did not virtually represent the voters' interests in state court.

 It remains possible, however, that the plaintiff voters and candidates are in privity if the candidates in fact are controlling the voters' federal suit, not to advance the interests of all voters who submitted challenged absentee ballots, but rather to further the interests of the candidates and a subset of voters whose interests *do* coincide exactly with those of the candidates. If the plaintiff voters are in reality the candidates' pawns, then by definition the plaintiff voters' interests are identical to the candidates' (and different from the interests of all similarly situated voters) and were adequately represented in the candidates' state-court lawsuit. And as *Wilks* explained, where a nonparty controls a party, identity of interest and adequacy of representation suffice to create privity between nonparties and parties to an earlier suit. 490 U.S. at 762 n. 2, 109 S.Ct. 2180.

Aspects of the complaint in the federal suit, together with information revealed by the state-court proceedings, raise at least the possibility that the plaintiff voters are puppets and the candidates puppetmasters. The complaint, filed jointly by the voters and the candidates, challenges not the Board's decision to disregard all absentee ballots issued ostensibly in violation of state law and the district-court order, but only a very particular subset of those ballots.

In the state-court litigation, the four candidates petitioned to have a total of 83 ballots invalidated: Carman challenged 18, Gross challenged 24, Hoblock challenged 16, and Messercola challenged 25. Of the 83 challenged ballots, 43 are not at issue in this suit because no one disputes that the state court properly ruled on their validity. Which of the remaining 40 ballots, challenged in state court because they were issued based on a November 2003 application, are at issue in the current litigation is a critical question. The federal-court complaint, filed initially by Hoblock, Carman, and seven named voters, purports to be filed on behalf of those seven and "all other voters similarly situated." Compl. ¶ 2. The complaint refers to "the 27 class members that are the subject of this action," *id.* ¶ 38, and to "27 absentee ballots upon which voters cast ballots." *Id.* ¶ 31. The complaint, however, actually names only 26 voters (the 7 named plaintiffs and 19 others). *Id.* ¶ 32.

It turns out that the 26 named voters are a very particular subset of the 40 voters whose ballots were challenged because those ballots were issued based on a November 2003 application: they are voters whose ballots were challenged in state

court by candidates Gross and Messercola. Of the 14 remaining voters in the group of 40 (i.e., those 14 not named in the complaint), 13 were challenged in state court by Hoblock or Carman, and 1 (Christina Marbach Kellett) was challenged by Messercola. It seems that the complaint inadvertently failed to name this last voter, hence the 1–person discrepancy between the 27 absentee ballots referred to in the complaint and the 26 named voters.

If the named voter plaintiffs are suing only to require the Board of Elections to count ballots that candidates Gross and Messercola challenged in state court, despite purporting to sue on behalf of "all other voters similarly situated," then the voter plaintiffs are effectively suing only on behalf of Hoblock and Carman, not on behalf of all 40 voters whose ballots were invalidated because they were issued based on a November 2003 application. This suggests that the voter plaintiffs may actually be the pawns of Hoblock and Carman and that, rather than advancing the interests of all similarly situated voters (which may diverge from the candidates' interests), they are advancing only the candidates' interests.

When pressed at oral argument to explain why the complaint named only 26 voters despite the voters' asserted interest in representing all similarly situated voters, the voters' counsel explained that he filed the complaint hastily. He maintained that the voters did indeed intend to represent all similarly situated voters, and that although he had copied sections from the candidates' complaint, the voters were not simply trying to have those ballots counted that candidates Hoblock and Carman (but not Messercola and Gross) wanted counted.

This explanation is not wholly satisfying. Nonetheless, if the voters indeed represent the interests of all 40 voters whose ballots were rejected by the state court because they were issued based on a November 2003 application, then the voters' interests are plainly distinct from the candidates' interests. And to the extent that the voters, represented by counsel independent from the candidates' counsel, seek to advance their own interests by having all 40 disputed ballots counted—some of which candidates Hoblock and Carman argued (at least initially) in state court should not be counted—the voters could not be considered to be under the candidates' control. The requirements for privity under federal law—identity of interests and adequacy of representation—are thus absent if the voters seek to have all 40 disputed ballots counted.

We therefore remand the case with instructions that the district court grant the voters the opportunity to amend their complaint to make clear whether they seek to have all 40 disputed ballots counted. If the voters so amend their complaint, *Rooker–Feldman* will not bar their suit, for by amending the complaint the voters will demonstrate that they are not in privity with the candidates. Conversely, if the voters decline to amend their complaint, they will demonstrate that in fact they are the tools of, and therefore in privity with, Hoblock and Carman, and *Rooker–Feldman* will bar their suit.

### B. Ordinary preclusion principles

 We now turn to whether the federal action is barred by ordinary preclusion principles. *Exxon Mobil* teaches that the narrow *Rooker–Feldman* inquiry is distinct from the question whether claim preclusion (res judicata) or issue preclusion (collateral estoppel) will defeat a federal plaintiff's suit. Because under pre-*Exxon Mobil* Second Circuit law, *Rooker–Feldman* was held to be coextensive with preclusion, the parties fully briefed the

preclusion issues in this case, and the district court's decision not to apply *Rooker–Feldman* was equally a decision that neither claim nor issue preclusion foreclosed the voters' suit. We therefore review the district court's decision as a matter of preclusion law, apart from the *Rooker–Feldman* question. Because the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state, New York preclusion law applies.

### 1. Standard of review

 Claim and issue preclusion are affirmative defenses that frequently turn on pure questions of law, or on the application of law to undisputed facts, and we therefore generally review de novo a district court's ruling on preclusion. *See, e.g., Diorinou v. Mezitis,* 237 F.3d 133, 138–39 (2d Cir.2001); *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 303 (2d Cir.1999). In some cases, however, whether preclusion applies will turn on the question of privity. Courts and commentators differ as to whether privity is a question of law or of fact. The Fifth Circuit seems to have taken both positions, first observing that the "determination of identity between litigants for the purpose of establishing privity is a factual question," *Astron Indus. Assocs., Inc. v. Chrysler Motors Corp.,* 405 F.2d 958, 961 (5th Cir.1968), and later stating (without suggesting that *Astron* was being overruled) that "federal cases have recognized that 'privity' denotes a legal conclusion rather than a judgmental process," *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.,* 546 F.2d 84, 95 (5th Cir.1977).

Decisions from this circuit, too, are in discord on the question. In *Expert Electric, Inc. v. Levine,* this court observed that the "identity of parties, qualified by the doctrine of privity . . . is a factual determination of substance, not mere form." 554 F.2d 1227, 1233 (2d Cir.1977) (citing *Astron Indus.,* 405 F.2d at 961). Subsequently, however, *Stone v. Williams,* 970 F.2d 1043, 1059 (2d Cir.1992), cited with seeming approval the Fifth Circuit's characterization in *Southwest Airlines* of privity as a legal conclusion. More recently still, *Chase Manhattan Bank* cited *Expert Electric* for the proposition that "[s]ome courts have . . . held that the [privity] inquiry is a factual issue." 56 F.3d at 346. The language in *Chase Manhattan Bank*—"some courts" where "this court" would have been proper—suggests ambivalence over whether privity should always be considered a question of fact.

The Seventh Circuit has tackled the question head-on and resolved it by holding that because privity sometimes turns on facts and other times turns on legal questions, "[t]he question of privity is therefore particularly amenable to a sliding-scale standard of review." *In re L & S Indus., Inc.,* 989 F.2d 929, 932–33 (7th Cir.1993). Similarly, a leading treatise notes that

> the ultimate conclusion [about privity] may turn essentially on matters of fact in some cases, while in other cases it may turn primarily on legal concepts. The standard of review is shaped by the specific setting, permitting free review when legal appraisal of the underlying relationships dominates the inquiry and limiting review to a clear-error standard when factual issues dominate.

18A Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d § 4449, at 353 (2002).

 We need not resolve in this case when, as a general matter, privity should be treated as a question of law or a question of fact. Instead, we note that the district court's determination about privity

rested on the purely legal proposition that "'[c]andidates' rights, though related to voters' rights, are said to be distinct from them.'" *Hoblock,* 341 F.Supp.2d at 173 (quoting *Griffin v. Burns,* 570 F.2d 1065, 1072 (1st Cir.1978)). Based on this proposition, the district court found that the candidates' interest in having the voters' absentee ballots counted was "insufficient to create privity." *Id.* Because we review questions of law de novo, we will review de novo the district court's no-privity finding under the circumstances of this case, as well as its rulings on other legal questions related to claim and issue preclusion.

### 2. Issue preclusion

Under New York law, issue preclusion will apply only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Moccio,* 95 F.3d at 200 (internal quotation marks omitted). The issue in question in the federal suit is whether voters' federal constitutional rights are violated by the Board of Elections' refusal to count absentee ballots on the ground that those ballots, although issued to voters by the Board of Elections, were invalid under state law. The Board maintains that the New York Court of Appeals necessarily decided this constitutional question in *Gross III,* 3 N.Y.3d 251, 785 N.Y.S.2d 729, 819 N.E.2d 197, and points out that Judge Rosenblatt's dissent refers to a First Circuit case, *Griffin v. Burns,* 570 F.2d 1065 (1st Cir.1978), that decided an election dispute similar to the one in this case on federal constitutional grounds. *See Gross III,* 785 N.Y.S.2d 729, 819 N.E.2d at 206 n. 2 (Rosenblatt, J., dissenting). The Board also points out that the opinion dissenting in part from the New York Appellate Division's ruling in *Gross II* accuses the majority of "depriv[ing] voters of their constitutional right to vote ...." 781 N.Y.S.2d at 176 (Spain, J., concurring in part and dissenting in part).

Certainly the authors of the dissenting opinions cited by the Board believed that the voters' constitutional rights were at stake. But to determine what issues were "actually and necessarily decided" by the New York Court of Appeals—and it is the preclusive effect of that decision alone that is in question—we look to the majority opinion. Where, as here, that opinion unambiguously relies on state law alone, we cannot say that the court decided federal constitutional questions just because a dissenting judge in the Court of Appeals (let alone dissenting judges in the Appellate Division) would have preferred that the case be decided differently on constitutional grounds. The New York Court of Appeals held that "the absentee ballots collected in violation of both a federal court order and article 8 of the [New York] Election Law are invalid ...." *Gross III,* 785 N.Y.S.2d 729, 819 N.E.2d at 199. It explained further that "in New York, the right to vote by absentee ballot is purely a statutory right." *Id.* Nowhere does the Court of Appeals discuss the voters' constitutional rights, and we therefore agree with the district court that "[t]he issue of whether the invalidation of the absentee ballots would violate the Fourteenth Amendment was not addressed by the Court of Appeals," *Hoblock,* 341 F.Supp.2d at 173, and issue preclusion thus does not bar the voters from litigating this issue in federal court.

The district court further held that issue preclusion does not apply because the voters were not parties in the state-court proceeding and therefore lacked the requisite "full and fair opportunity" to litigate the question of their constitutional rights in state court. *Id.* Because our finding

that the voters' constitutional rights were not at issue in the state-court litigation disposes of the issue-preclusion question, we can resolve that question without deciding whether the voters were (actually or constructively) parties to that litigation.

### 3. Claim preclusion

■ The claim-preclusion question, by contrast, turns entirely on whether the voters were parties, or were in privity with parties, to the state-court litigation. *See Ferris v. Cuevas,* 118 F.3d 122, 126 (2d Cir.1997) (explaining that claim preclusion only applies against parties to a prior lawsuit and their privies). If so, the voters' constitutional claims will be barred by claim preclusion if they could have been raised in state court and they arise from the "same transaction or series of transactions" as the state-court claims. *Id.* (internal quotation marks omitted). No one disputes that the voters' constitutional claims could have been raised before the state court and arise from the same transaction—the disputed election and the Board's refusal to count certain absentee ballots—that gave rise to the state-court suit. Also, no one disputes that the voters were not formally parties to the state-court litigation. The only question, then, is whether the voters should be deemed to be in privity with the candidates (the state-court plaintiffs).

The district court held that the voters were not in privity with the candidates because the candidates' interest in having the voters' absentee ballots counted was "insufficient to create privity." *Hoblock,* 341 F.Supp.2d at 173. The district court's no-privity finding was driven by its conclusion that voters' rights and candidates' rights are distinct. *Id.* The Board disagrees, arguing in its brief that "there is no viable distinction between the interests of the plaintiff candidates and the plaintiff

voters . . . ." The Board also argues that the voters and the candidates have a sufficiently close relationship to support a finding of privity. On the record before this court and, in particular, the current state of the pleadings, we are unable to conclude whether the voters are in privity with the candidates.

We arrive at this determination by reasoning similar to that reflected in our discussion above of privity for *Rooker–Feldman* purposes. But because the *Rooker–Feldman* privity question turns on federal law, while the question of privity for claim-preclusion purposes is a matter of state law, we consider the privity question again in this section in light of New York law.

On facts very similar to those in· this case, a panel of this court distilled from New York claim-preclusion cases the following rule: plaintiffs in a federal suit that follows a state suit are in privity with the state plaintiffs where "their interests are the same and [the federal plaintiffs] are controlled by the same party or parties" as the state plaintiffs. *Ferris,* 118 F.3d at 128. *Ferris v. Cuevas* involved two lawyers who had organized a referendum campaign to amend the New York City Charter. The lawyers first sued the city in state court because the city clerk refused to place on the ballot the referendum questions, despite the lawyers' submission of petitions, signed by over 100,000 voters, that the lawyers contended complied with state law about referendums. The state trial court held that the city clerk acted properly in refusing to place the referendum questions on the ballot; that decision was upheld on appeal. *Id.* at 124–25.

Following the lawyer-organizers' loss in state court, two voters who had signed the petitions sued the city clerk in federal district court on behalf of themselves and other petition signers, arguing that the city clerk violated their First Amendment

rights by refusing to place the referendum questions on the ballot. The voters were represented by one of the lawyers who had organized the referendum campaign and who had been a plaintiff in the failed state lawsuit. *Id.* at 125. The federal district court dismissed the plaintiffs' complaint. This court upheld the dismissal, finding that claim preclusion barred the federal suit notwithstanding that the federal plaintiffs were not parties to the state suit. Noting that mere identity of interest between the state and federal plaintiffs was necessary but not sufficient to establish privity between them, we found privity because the lawyer-organizer/state plaintiff's "involvement in and control of every aspect of both the state and federal actions presents a connection of much greater magnitude than identity of interest alone." *Id.* at 128.

To find privity under New York law between the voters and candidates in this case, therefore, we must find two things: (1) identity of interest, and (2) sufficient control by the candidates over the voters that we should deem them to be in privity with each other. In this case, these two findings depend largely on the same facts. The facts that tend to suggest that the voters may be controlled by the candidates also suggest that the interests of the voters before the court, to the extent that those interests differ from the interests of all similarly situated voters, may coincide exactly with the candidates' interests. If the candidates have so far controlled the plaintiff voters that the voters advance only those interests that they share with the candidates, then the voters are in privity with the candidates and claim preclusion bars their federal constitutional claims. "Control is thus the crux of the finding of privity in a case such as this." *Id.*

Unlike the voters in *Ferris*, the voters in this case have lawyers who are at least formally unconnected to the candidates or their lawyers. The allegations in the voters' complaint, however, call into question whether the lawyers for the voters and the candidates have so closely coordinated their litigation strategies that the voters are in effect the candidates' puppets. Having discussed this question in detail above in relation to *Rooker–Feldman* privity, we need not reiterate here why the voters' federal complaint and the record of the state-court proceedings suggest that the candidates may be controlling the voters. If, however, the plaintiff voters choose not to amend their complaint upon remand to advance the rights of all similarly situated voters, this will demonstrate that they are in privity with the candidates and are subject to claim preclusion under New York law (in addition to being barred by *Rooker–Feldman* from maintaining their suit).

## C. The preliminary injunction

 Finally, we turn to the Board's argument that the preliminary injunction should nevertheless be vacated because the voters have not established a likelihood of success on their constitutional claims. We review for abuse of discretion the district court's grant of a preliminary injunction. *See, e.g., Rodriguez v. DeBuono,* 175 F.3d 227, 233 (2d Cir.1999) (per curiam). A district court abuses its discretion in granting a preliminary injunction if it applies the wrong legal standard, rests its decision on a clearly erroneous finding of fact, or issues an injunction containing an error of form or substance. *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir. 1997) (per curiam).

 A party moving for an injunction against government action taken in the public interest pursuant to a statutory

or regulatory scheme—such as the Board's tallying of absentee ballots—must show two things: 1) that the injunction is necessary to prevent irreparable harm to the movant; and 2) that the movant is likely to succeed on the merits. *Rodriguez*, 175 F.3d at 233. Where the movant seeks a mandatory injunction (one that will alter the status quo) rather than a prohibitory injunction (one that maintains the status quo), the likelihood-of-success standard is elevated: the movant must show a clear or substantial likelihood of success. *Id.* The injunction in this case leaves the election undecided, which was the status quo before the federal suit was filed. Therefore, although in some cases the distinction between a mandatory and a prohibitory injunction may be unclear, *see Jolly v. Coughlin*, 76 F.3d 468, 473–74 (2d Cir. 1996), the injunction in this case is plainly prohibitory and the voters need only show a likelihood of success, *see Rodriguez*, 175 F.3d at 233.

■■■ The district court found that the plaintiff voters will be irreparably harmed if the Board certifies the election results without counting their absentee ballots. We agree. The Board, in its opening brief, did not contest the district court's irreparable-harm finding. In its reply brief, the Board challenges one aspect of that finding, arguing that the district court wrongly concluded that the Board intended to destroy the absentee ballots after certifying the election results. Whether the Board intends to destroy the ballots is beside the point; if the election results are certified without counting the plaintiff voters' ballots, the plaintiff voters will suffer "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995) (internal quotation marks omitted). Such

an injury meets the standards for irreparable harm.

A more difficult question is whether the voters have demonstrated that they are likely to succeed on the merits of their claim that the Fourteenth Amendment's due-process and equal-protection clauses entitle them to have their votes counted. The Board argues that its "good faith but erroneous decision to issue the absentee ballots to the subject voters" is not the sort of intentional state action necessary to support a finding that the Board violated the voters' constitutional rights. The voters argue that the district court correctly held that "the intentional decision by the Board to send out absentee ballots to voters and then to refuse to tally those ballots," *Hoblock*, 341 F.Supp.2d at 177, is the type of decision that can give rise to a constitutional violation.

We hold that the district court did not abuse its discretion in finding that the plaintiff voters are likely to succeed on their constitutional claim, though we leave to the district court the task of deciding, in the first instance, the merits of that claim. The key question is whether the Board's actions in sending absentee ballots to the plaintiff voters and then refusing to count them is "intentional state conduct directed at impairing a citizen's right to vote," *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir.2005), or is instead merely "a 'garden variety' election dispute," *id.* (quoting *Griffin*, 570 F.2d at 1076). Although the district court lacked the benefit of this court's decision in *Shannon* when it decided to grant the preliminary injunction, the district court properly identified this central question when it noted, relying on *Gold v. Feinberg*, 101 F.3d 796 (2d Cir.1996), that "a § 1983 action [alleging a constitutional violation] cannot be sustained where mere 'unintended irregularities' in the conduct of elections occur ...." *Hoblock*, 341

98

F.Supp.2d at 176 (quoting *Gold,* 101 F.3d at 801).

On the one hand, the Board's misreading of the district court's order, which resulted in the Board's sending out absentee ballots for the April 2004 general election based on absentee-ballot applications submitted for the Fall 2003 elections, could be seen as simply negligent. On the other hand, the Board's decision not to count the ballots, despite at least arguably having misled the voters into not filing new absentee-ballot applications by issuing the ballots, could be seen as sufficiently intentional to meet the threshold requirement for a constitutional violation.

Faced with an almost identical factual situation in *Griffin v. Burns,* the First Circuit held that where "the election process itself reaches the point of patent and fundamental unfairness," voters could seek federal relief for a state's infringement of their voting rights. 570 F.2d at 1077. To the extent that *Griffin* held that "fundamental unfairness" alone, in the absence of intentional state conduct, sufficed to make out a constitutional violation, *Griffin* is not good law in the Second Circuit in light of *Shannon.* But *Shannon* cited *Griffin* as a case that "involved an intentional act on the part of the government or its officials," *Shannon,* 394 F.3d at 96, at least suggesting that when election officials refuse to tally absentee ballots that they have deliberately (even if mistakenly) sent to voters, such a refusal may violate the voters' constitutional rights. We therefore believe that, in light of both *Shannon* and *Griffin,* the voters have shown a sufficient likelihood of success on the merits that the district court acted within its discretion when it preliminarily enjoined the Board from certifying the election results without tallying the challenged absentee ballots.

* Substituted pursuant to Fed. R.App. P. 43(c).

## III. CONCLUSION

If the plaintiff voters are not simply puppets controlled by the candidates for the purposes of this litigation, then the voters are sufficiently distinct from the candidates to escape both the *Rooker–Feldman* bar and claim preclusion under New York law. On remand, the district court is directed to afford the voters the opportunity to amend their complaint to indicate whether they intend to represent all 40 similarly situated voters. We leave the preliminary injunction in place and remand for further proceedings in accordance with this opinion.